

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### JASPER DIVISION

| | |
|---|---|
| **FREDRICK EARL HIGHT, SR.** ) <br> **as Administrator of the Estate of** ) <br> **Fredrick Earl Hight, II,** ) <br> ) <br>     **Plaintiff,** ) <br> ) <br> **v.** ) <br> ) <br> **NICK SMITH, Walker County** ) <br> **Sheriff, in his individual capacity** ) <br> **and in his official capacity as** ) <br> **Walker County Sheriff, and JOHN** ) <br> **"JJ" JACKSON, Walker County** ) <br> **Deputy Sheriff, in his individual** ) <br> **capacity and in his official capacity,** ) <br> ) <br>     **Defendants.** ) | **CASE NO.:  6:21-cv-01307-LSC** |

## MEMORANDUM OF OPINION

On February 26, 2021, Fredrick Earl Hight, Sr. ("Hight Sr.") called 911 because his mentally ill son, Fredrick Earl Hight, Jr. ("Hight Jr."), was angry and violent. Deputy John "JJ" Jackson ("Deputy Jackson") responded to the call and, after a struggle ensued when trying to restrain Hight Jr., shot and killed Hight Jr. Deputy Jackson had previously been sued on three occasions, two of which pertained to his alleged use of excessive force against mentally ill individuals.

Hight Sr., the personal representative of Hight Sr.'s estate, has brought this action against Deputy Jackson, alleging excessive force and wrongful death. Hight

Sr. also asserts claims against Sheriff Nick Smith ("Sheriff Smith") for deliberate indifference in hiring Deputy Jackson and for wrongful death. Now before the Court is Defendants' Motion for Summary Judgment. (Doc. 72.) For the reasons explained below, the Motion is granted in part and denied in part.

## I.   FACTUAL BACKGROUND[1]

### A. Deputy Jackson's employment with the Walker County Sheriff's Office and occupational history

Deputy Jackson was hired by Sheriff Smith in 2018 or 2019 to work for the Walker County Sheriff's Office as a part-time deputy. (Doc. 73 ¶ 2; Doc. 82 at 14 ¶ 3; Doc. at 73:7-12.) He was hired full time in November 2020. (Doc. 82 at 14 ¶ 3.) Chief Deputy Anthony Leach primarily vets candidates for hire (Doc. 66-29 at 61:3–62:15), but Sheriff Smith is the ultimate hiring authority (Doc. 80-1 at 75:4-8). As a part of the hiring process, Chief Deputy Leach did not call Deputy Jackson's references or prior employers (*Id.* at 30:19–31:4, 33:3–5), request performance evaluations from prior employers or application documents from Civil Service (*Id.* at 33:6-17), or conduct a lawsuit check on Deputy Jackson (*Id.* at 34:9–19). Sheriff Smith generally knew that Deputy Jackson had been named in prior lawsuits, but he

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

testified that being named in a lawsuit "wouldn't matter," though the result of the lawsuit could make a difference. (Doc. 66-29 at 65:17–19, 66:4–11.)

Prior to joining the Walker County Sheriff's Office, Deputy Jackson had worked in law enforcement since 1992, serving various municipalities. (Doc. 73 ¶ 1.) He had been named in three lawsuits, two of which alleged that he used excessive force against a mentally ill individual. (Doc. 73 ¶ 3; Doc. 82 at 15 ¶ 7.) There was never an ultimate finding of liability in any of those cases. (Doc. 73 ¶ 3.)

## B. Deputy Jackson's interaction with Hight Jr.

On February 26, 2021, Hight Sr. called 911, requesting assistance in having his twenty-seven-year-old son, Hight Jr., hospitalized because Hight Jr. was angry and violent, throwing tools. (Doc. 66-6.) On the call, Hight Sr. described Hight Jr. as being one of "the most schizophrenic men" that he had ever seen. (*Id.*) Hight Sr. cautioned that Hight Jr. said that he would kill anyone who came in and that he wanted to kill cops. (*Id.*) Hight Sr. informed the 911 dispatcher that there were tools and knives in the house but no guns. (*Id.*) Hight Sr. also suggested that two officers were needed. (*Id.*)[2]

---

[2] To the extent Plaintiff objects to the typed transcript of the 911 call, the Court's portrayal of the 911 call is drawn directly from listening to the call. Further, while in his deposition Hight Sr. testified that his words on the call were "moved around" (Doc. 66-30 at 9 87:7–8), Plaintiff does not pursue this objection in its response to the summary judgment motion and actually "invites the Court to listen" to the recording. (Doc. 82 at 3 ¶ 19.) The Court thus assumes Plaintiff has no objection to the recording itself.

3

Deputy Jackson quickly arrived on the scene. (Doc. 73 ¶ 22; Doc. 66-28 at 122:15–17.) At the time Deputy Jackson arrived, two other deputies and an ambulance were en route. (Doc. 73 ¶ 22; Doc. 66-28 at 11:8–22.) Because Deputy Jackson did not know when backup would arrive, he decided to enter the residence where Hight Jr. was. (Doc. 73 ¶ 26.) Hight Sr. and his sister, Elizabeth Doty, accompanied Deputy Jackson inside the residence. (Doc. 66-28 at 133:9–22; Doc. 64 ¶ 12; Doc. 66-1.) Upon entering, they saw an unarmed Hight Jr. standing near his bedroom and the kitchen. (Doc. 66-28 at 63:1–8; Doc. 66-30 at 49:16–50:6.)

In his haste, Deputy Jackson did not turn on his body camera. (Doc. 66-28 at 207:12–21.) But Hight Sr. recorded much of what happened next on his cellphone. (Doc. 66-1.) [3]

The video is very shaky when it begins, but both Hight Sr. and Deputy Jackson testified that Hight Jr. was in or moving towards the kitchen. (Doc. 66-30 at 50:14–15; Doc. 66-28 at 65:4–4.) [4] Deputy Jackson asked Hight Jr., "Where're you going?" (Doc. 66-1 at 0:00–03; Doc. 73 ¶ 33.) Hight Jr. rambled for a bit and then grabbed a

---

[3] When there is a video recording of an event, a court is to "accept facts clearly depicted in [it] even if there would otherwise be a genuine issue about the existence of those facts. But where the recording does not clearly depict an event or action, and there is evidence going both ways on it, we take the estate's version of what happened." *Shaw v. City of Selma*, 884 F.3d 1093, 1097 n.1 (11th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)).

[4] The parties dispute whether the video captures Deputy Jackson's first verbal interaction with Hight Jr. However, as there is conflicting testimony on this point (Doc. 66-28 at 17:3–18:21, 63:1–64:11; Doc. 66-30 at 50:1–17), the Court draws the inference in Plaintiff's favor and thus assumes that the video portrays all communications between Deputy Jackson and Hight Jr.

red paring knife and said, "He's got a weapon, I've got a weapon." (Doc. 66-1 at 0:11; Doc. 73 ¶ 35.) Deputy Jackson instructed Hight Jr. to put the knife down a few times, but Hight Jr. instead came out of the kitchen towards Deputy Jackson with the knife in hand. (Doc. 66-1 at 0:13–20; Doc. 73 ¶¶ 36–37.) At that point, Deputy Jackson drew his firearm and ordered Hight Jr. to drop the knife and get on the ground. (Doc. 66-1 at 0:21–28; Doc. 73 ¶ 37.) After Jackson repeated this order several times, Hight Jr. placed the knife on the table, raised his hands, and got in a kneeling position. (Doc. 66-1 at 0:28; Doc. 73 ¶ 38.)

Deputy Jackson, with his firearm in one hand, then attempted to handcuff Hight Jr. (Doc. 66-1 at 0:44–0:46; Doc. 73 ¶ 41.) At this time, Hight Jr. is positioned closer to the back wall and Deputy Jackson is between Hight Jr. and the camera. (Doc. 66-1 at 0:44.) Hight Jr. resisted being handcuffed, and Jackson was unable to handcuff him. (Doc. 66-1 at 0:38–50; Doc. 73 ¶ 42.) According to Deputy Jackson, Hight Jr. was very strong, though Hight Jr. weighed less than Deputy Jackson. (Doc. 66-14 at 4; Doc. 66-28 at 176:18–21.) Jackson told Hight, "Don't you do it. I will f*** you up." (Doc. 66-1 at 0:48–50; Doc. 73 ¶ 43.) Hight continued to resist and attempted to stand but was forced back to his knees by Deputy Jackson. (Doc. 66-1 at 0:55–1:08; Doc. 73 ¶ 46.) Hight Jr.'s hand reached up, and Deputy Jackson raised his arm that was holding the firearm. (Doc. 66-1 at 1:06–08; Doc. 73 ¶¶ 47–48.) It is unclear whether Hight Jr. reached for Deputy Jackson's firearm at this point. (Doc.

66-1.) Deputy Jackson said to Hight Jr., "I'm going to shoot you. I'm going to shoot you." (Doc. 66-1 at 1:06–10; Doc. 73 ¶ 47.) Hight Jr. then said, "That ain't s***. That ain't s*** cuz. What's that? That's not even a gun! Joke's on you. Joke's on you." (Doc. 66-1 at 1:10–16; Doc. 73 ¶¶ 50–52.) Deputy Jackson then again moved his arm that was holding the firearm backwards and away from Hight Jr. (Doc. 66-1 at 1:16; Doc. 73 ¶ 54.) It is unclear whether Hight Jr. attempted to get Deputy Jackson's firearm at this point. (Doc. 66-1.)

Hight Jr. grabbed Deputy Jackson's shirt, also grabbing Deputy Jackson's body camera. (Doc. 66-1 at 1:16; Doc. 66-28 at 187:3–21.) In the tussle, Hight Jr. then twisted around, now closer to the cellphone camera, and continued to grab Deputy Jackson's shirt. (Doc. 66-1 at 1:17–19.) It is unclear whether Hight Jr. attempted to get Deputy Jackson's firearm during any point in which Hight Jr. was also grabbing Deputy Jackson's shirt. (Doc. 66-1.) Deputy Jackson then fired his weapon, shooting Hight Jr. (Doc. 66-1 at 1:19–22.) Hight Jr. was killed by the gunshot. (Doc. 73 ¶ 63.)

## II.   STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court "must view all evidence most favorably toward the nonmoving party, and all justifiable inferences are to be drawn in the

nonmoving party's favor." *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir. 1990). "But when 'opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it,' a court should not adopt the contradicted version for purposes of ruling on a motion for summary judgment." *Singletary v. Vargas*, 804 F.3d 1174, 1183 (11th Cir. 2015) (quoting *Scott*, 550 U.S. at 380). The Court does not weigh the evidence as fact-finder; rather, it must "determin[e] whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986).

## III. ANALYSIS

Plaintiff asserts three causes of action: 1) a Fourth Amendment excessive force claim against Deputy Jackson, brought pursuant to 42 U.S.C. § 1983; 2) a deliberate indifference in hiring claim against Sheriff Smith, brought pursuant to 42 U.S.C. § 1983; and 3) state-law wrongful death claims against both Deputy Jackson and Sheriff Smith. (Doc. 32.) The Defendants contend that they are entitled to qualified immunity on the § 1983 claims and State immunity on the wrongful death claims. The Court evaluates each claim in turn.

### A. Deputy Jackson is not entitled to qualified immunity on the excessive force claim.

Qualified immunity shields government officials from being sued for damages in their personal capacity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "In order to be entitled to qualified immunity, an official must first establish that he was acting within his discretionary authority when he engaged in the allegedly unlawful conduct." *Hunter v. City of Leeds*, 941 F.3d 1265, 1278 (11th Cir. 2019) (citing *Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2012)). After the official makes this showing, the burden shifts to the plaintiff to show that 1) the defendant violated a constitutional right and 2) the right was clearly established at the time of the violation. *See Hunter*, 941 F.3d at 1278 (citing *Morton*, 707 F.3d at 1281).

As both parties agree that Deputy Jackson was acting within his discretionary authority, the relevant question becomes whether Deputy Jackson's use of deadly force was excessive and in violation of clearly established law. The Court turns first to whether a reasonable jury could find Deputy Jackson's use of deadly force violated Hight Jr.'s Fourth Amendment rights.

Excessive force claims arising under the Fourth Amendment are subject to an "objective reasonableness standard." *Singletary*, 804 F.3d at 1181. To be clear, this is a wholly objective inquiry that "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014)). Courts are to consider "the severity of the crime at issue,

whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1989)). "And in deadly force cases [courts] are to determine whether the officer had probable cause to believe that the suspect posed a threat of 'serious physical harm' to the officer or others, and whether the officer had given the suspect a warning about the use of deadly force, if doing so was feasible." *Cantu v. City of Dothan*, 974 F.3d 1217, 1229 (11th Cir. 2020). It is also relevant if "the officer 'had [an] articulable basis to think [the suspect] was armed.'" *Salvato v. Miley*, 790 F.3d 1286, 1293 (11th Cir. 2015) (quoting *Garner*, 471 U.S. at 20). But not all of these factors must be present for an officer's use of deadly force to be reasonable; rather, it is usually sufficient if the officer had probable cause to believe the suspect posed a serious threat of physical harm and the officer provided warning, if feasible. *See Cantu*, 974 F.3d at 1229.

Make no mistake: "[T]he law does not require officers in tense and dangerous situations to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007). And the Court has a duty to view the situation "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," understanding that officers must

make "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Singletary*, 804 F.3d at 1181 (quoting *Plumhoff*, 572 U.S. at 775).

"But resisting arrest alone is not enough to justify the use of deadly force." *Cantu*, 974 F.3d at 1230 (citing *Smith v. LePage*, 834 F.3d 1285, 1297 (11th Cir. 2016)); *see also Salvato*, 790 F.3d at 12193–94; *Gilmere v. City of Atlanta*, 774 F.2d 1495, 1496–96, 1502 (11th Cir. 1985) (en banc), *abrogated on other grounds by Graham*, 490 U.S. 386, *as recognized in Salvato*, 790 F.3d at 1294. This is especially true "when the resistance is non-violent," even if it is "vigorous." *Cantu*, 974 F.3d at 1221, 1229. And it is for that reason, when making all factual inferences in Plaintiff's favor, that Plaintiff has successfully shown that Deputy Jackson's use of deadly force could be found to be unreasonable.

Deputy Jackson arrived on the scene with the purpose of obtaining medical care for Hight Jr.—at no point was Hight Jr. under arrest, even after Hight Jr. brandished the paring knife. (Doc. 66-28 at 167:12–23.) After Hight Jr. dropped the paring knife, he remained unarmed during the remainder of the encounter. (Doc. 66-1.) While Deputy Jackson suggests that it was "at least a possibility" that Hight Jr. was still armed because he had emerged from the kitchen with the paring knife (Doc. 73 at 29), Deputy Jackson does not testify to, nor does the video depict, Hight Jr. ever reaching for another knife on his person or otherwise.

Then began the tussle between Deputy Jackson and Hight Jr. It is undisputed that Hight Jr. actively resisted Deputy Jackson's attempts to restrain him. It is also undisputed that Hight Jr. never punched, kicked, or otherwise landed any blows on Deputy Jackson. But the dispositive issue is whether, during the course of the struggle, Deputy Jackson acquired probable cause to believe that his own life or the lives of Hight Sr. and Doty were in imminent danger, so as to justify the use of deadly force. Deputy Jackson testifies that Hight Jr. attempted to wrestle the firearm from his hand, at least three times: twice when Deputy Jackson raised and moved his left arm away and then the final moment before Deputy Jackson fired the fatal shot. According to Deputy Jackson, he used deadly force because Hight Jr. was "trying to get [his] gun." (Doc. 73 ¶ 57.)

Deputy Jackson's testimony is contradicted by the testimony of Hight Sr. (Doc. 66-30 at 75:15–22.) And the video is unclear as to whether Hight Jr. ever made an attempt for Deputy Jackson's firearm or any sudden movement that could be construed as an attempt for the firearm. *See Murphy v. Dennings*, 626 F. App'x 836, 840 (11th Cir. 2015) (finding that an officer was entitled to use deadly force when an armed robbery suspect, who had engaged in a high-speed chase with police and hit two police cars, made a sudden movement towards his waistband); *Hammett v. Paulding County*, 875 F.3d 1036, 1049 (11th Cir. 2017) (finding that deadly force

was reasonable when the decedent quickly moved his hand near the officer's head with an unidentified object in hand).

While Deputy Jackson argues that under *Harris-Billups on Behalf of Harris v. Anderson*, 61 F.4th 1298 (11th Cir. 2023) the Court should draw the inference from the video that, based on Hight Jr.'s movement and prior actions, Deputy Jackson reasonably believed Hight Jr. possessed violent intent (Doc. 73 at 32), *Harris-Billups* is distinguishable. In *Harris-Billups*, the Eleventh Circuit held that an officer's use of deadly force was reasonable because the decedent had access to two firearms that were within "lung[ing]" distance and had surprised officers with the second firearm after discarding the first, had engaged in a shootout with the officers, had exhibited an "unstable frame of mind," and had violently lurched precisely before the fatal shot. *Id.* at 1302–03. There, the Eleventh Circuit determined that the video confirmed the sudden lurch by the decedent, which a reasonable officer could reasonably interpret as the commencement of another attack. *Id.* at 1304. In contrast, the Court does not find Hight Sr.'s cellphone video to be so clear. Therefore, viewing the evidence in the light most favorable to Plaintiff, the Court cannot definitively say that Hight Jr. reached, or appeared to reach, for Deputy Jackson's firearm. The jury will need to consider the disputed evidence and make this determination.

Further, accepting the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Deputy Jackson was never at serious risk of being overpowered by Hight Jr. During the video, Deputy Jackson remained on his feet the entire time. In contrast, except for a brief moment when Hight Jr. attempted to stand, Hight Jr. remained on his knees or on his side for the entirety of the struggle. Deputy Jackson was, at all times, above Hight Jr. Hight Jr. grabbed but never struck Deputy Jackson. And in fact, Deputy Jackson did not dispute that he remained in control of the situation up until he fired his service weapon. (Doc. 82 at 13 ¶ 1.) Accordingly, under these facts, Plaintiff has met his burden in showing that a reasonable jury could find a constitutional violation.

The Court also finds that Plaintiff has met his burden in showing Deputy Jackson's use of deadly force could be found unreasonable under clearly established law. There are three ways a plaintiff can show their constitutional rights were clearly established:

> First, he can point to a materially similar case decided by the Supreme Court, [the Eleventh Circuit], or the highest court of the relevant state that clearly establishes the unlawfulness of the police conduct. *Morton v. Kirkwood*, 707 F.3d 1276, 1282 (11th Cir. 2013). Second, even in the absence of such precedent, a plaintiff can point to a "broader, clearly established principle [that] should control the novel facts in [his] situation," *id.* (alterations in original) (quoting *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005)), provided that the principle gives the officer "reasonable warning that the conduct at issue violated constitutional rights," *Hope v. Pelzer*, 536 U.S. 730, 740, 122 S. Ct. 2508, 2516, 153 L.Ed.2d 666 (2002). Third, a plaintiff can show that the conduct at issue "lies so obviously at the very core of what the [Constitution] prohibits that the unlawfulness of the conduct was readily

apparent to the official, notwithstanding the lack of case law." *Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002).

*Hunter*, 941 F.3d at 1278 (cleaned up). Here, Plaintiff directs the Court to four cases, which he contends show that Deputy Jackson violated a clearly established right. In determining whether these cases put Deputy Jackson on notice, the Court notes that they "need not be a case on all fours[] with materially identical facts." *Salvato*, 790 F.3d at 1294 (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1277 (11th Cir. 2004)). But there must be "[a] close factual fit" between the cases, so that it is obvious to the officer that his conduct violates clearly established law. *Cantu*, 974 F.3d at 1232.

First, Plaintiff directs the Court to *Montero v. Nandlal*, 597 F. App'x 1021 (11th Cir. 2014). However, as that case is not binding authority, it cannot clearly establish a constitutional right. *See Corbitt v. Vicker*, 929 F.3d 1304, 1319 n.14 (11th Cir. 1019). Next, Plaintiff directs the Court to *Salvato v. Miley*, in which the Eleventh Circuit held that a reasonable jury could find that an officer's use of a deadly force, "without warning, on an unarmed, retreating suspect [was] excessive," even though the suspect had struck the officers multiple times shortly before. 790 F.3d at 1294. But that case also does not control because Hight Jr. was not retreating and was in striking distance.

However, Plaintiff's comparisons to *Gilmere v. City of Atlanta* and *Cantu v. City of Dothan* are persuasive. In *Gilmere*, the decedent nearly crashed with another

vehicle while driving under the influence. 774 F.2d at 1496. After an argument ensued, the other driver called the police and reported that the decedent had threatened him with a firearm. *Id.* Police later arrived at the decedent's home and instructed him to come with them for questioning. *Id.* at 1496–97. The decedent was a small man and was unarmed. *Id.* at 1502. The decedent "initially put up some resistance by attempting to flee and then flailing his arms about, but these efforts were ineffectual because of his drunken condition. The officers then began escorting him by force and, according to eyewitnesses, began beating him about the head." *Id.* at 1497. The decedent then broke free and "[d]uring the ensuing scuffle," one officer shot the decedent. *Id.* The Eleventh Circuit held that the use of force was unreasonable, despite the scuffle. *Id.* at 1502.

In *Cantu v. City of Dothan*, the decedent attempted to drop off a stray dog at the animal shelter but was unsuccessful after he refused to provide identification and fill out paperwork. 974 F.3d at 1222. The decedent then threatened to abandon the dog, causing one officer to follow the decedent out to his car. *Id.* An argument ensued, and the officer detained him and, using a phone brought to her by a second officer at the shelter, called for backup. *Id.* at 1222–23. When the backup officer arrived, the backup officer attempted to handcuff the decedent. *Id.* at 1224. A struggled ensued between the decedent and the officers, in which the officers wrestled with the decedent and slammed him against his car a few times. *Id.* The

decedent "vigorously" struggled, but never landed any blows on the officers or attempted to get their firearms. *Id.* at 1221, 1230. The decedent twice escaped the officers' grasp but was caught each time and tased. *Id.* at 1224–25. "In the last moments of the encounter, while trying to get free from three officers again, [the decedent] put his hand either on an officer's taser, or on the officer's wrist or hand that was holding the taser. In response, an officer pulled her service weapon and without warning, and to the surprise of the other two officers, shot [the decedent] while he was being held" by the backup officer, who was significantly heavier than the decedent. *Id.* at 1221; *see also id.* at 1224, 1231.

The Eleventh Circuit held that a reasonable jury could find the use of deadly force was unreasonable, explaining that the decedent had only committed a low-level offense and a reasonable jury could find the officer did not have probable cause to believe that the decedent posed a serious threat. *Id.* 1229–30. The Eleventh Circuit found that a reasonable jury could determine that the decedent was not in control of the taser but was simply resisting arrest, non-violently. *Id.* at 1230–31. The Court further opined that a reasonable jury could find the decedent did not pose a reasonable threat, even if he had control of the taser because the taser was in "drive stun mode" and there were three officers present. *Id.* at 1231. Interestingly, the Eleventh Circuit determined that, viewing the evidence in the light most favorable to the plaintiff, the use of force "was so obviously excessive that any reasonable

officer would have known it was unconstitutional, even without pre-existing precedent involving materially identical facts." *Id.* at 1235.

Both of these cases clearly establish that a reasonable jury could find that an officer's use of deadly force is unreasonable when an unarmed person accused of a low-level, non-violent offense resists arrest vigorously, but non-violently, and never attempts to gain control of the officer's firearm. Even Deputy Jackson admits that "*Cantu* has similarities to the case before this Court," though he argues that *Cantu* is distinguishable because Hight Jr., unlike the *Cantu* plaintiff, tried to gain control of an officer's firearm. (Doc. 85 at 1.) But because the evidence is disputed as to whether Hight Jr. ever attempted or appeared to attempt to grab Deputy Jackson's firearm, the similarities are unavoidable. *Gilmere* and *Cantu* clearly establish that a reasonable jury could find Deputy Jackson's conduct was unconstitutional.

To the extent Deputy Jackson argues that *Williams v. Deal*, 659 F. App'x 580, 602 (11th Cir. 2016) indicates that he did not violate clearly established law, the Court disagrees. *See generally Corbitt*, 929 F.3d at 1319 n.14 ("[N]on-binding persuasive authority can be used to indicate that a particular constitutional right is not clearly established."). In *Williams*, a panel of the Eleventh Circuit held that an officer's use of deadly force was reasonable when the officer shot a suspect after the suspect tussled with the officer; landed multiple punches on the officer's head; grabbed at the officer's firearm holster and made several violent jerking motions, so

forcefully that the officer struggled to hold onto his firearm; and then, after the two separated, advanced on the officer. 669 F. App'x at 601–02. But materially, when construing all inferences in Plaintiff's favor, a reasonable jury could find that there was not a violent struggle between Deputy Jackson and Hight Jr., and that Hight Jr. did not attempt or appear to attempt to take Deputy Jackson's firearm. Accordingly, even if *Williams* could be used to show a right was not clearly established, it is not analogous. Deputy Jackson is not entitled to qualified immunity.

## B. Sheriff Smith is entitled to qualified immunity on the deliberate indifference claim.

As previously discussed, when a defendant pleads qualified immunity and establishes that they were acting within their discretionary authority, the burden shifts to the plaintiff to show that the defendant violated a clearly established constitutional right. *See Hunter*, 941 F.3d at 1278. It is undisputed that Sheriff Smith was acting within his discretionary authority. (Doc. 73 at 25; Doc. 82 at 18.) Therefore, the Court now evaluates whether Plaintiff has met his burden in showing that Sheriff Smith violated a clearly established constitutional right. The Court notes that while Plaintiff asserted a claim regarding Sheriff Smith's hiring, retaining, and supervising of Deputy Jackson, Plaintiff focuses on the hiring aspect of the claim in combatting the qualified immunity defense. The Court therefore assumes Plaintiff

has abandoned the retention and supervision aspects of the claim, and intends to only pursue a claim for deliberate indifference in hiring Deputy Jackson.[5]

"To impose § 1983 liability based on a hiring decision," a plaintiff must establish that the supervisor's hiring decision was deliberately indifferent. *Prospero v. Sullivan*, 2:20-CV-110, 2023 WL 9023287, at *29 (S.D. Ga. Dec. 29, 2023) (quoting *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1313 (11th Cir. 2001)). "Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'" *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 411 (1997). "[W]hether Sheriff [Smith] failed to examine [Deputy Jackson's] record, partially examined it, or fully examined it, Sheriff [Smith's] hiring decision could not have been 'deliberately indifferent' unless in light of that record [Deputy Jackson's] use of excessive force would have been a plainly obvious consequence of the hiring decision." *Id.* at 415.[6]

---

[5] However, as any retention and supervision claims in this case would be closely related to Sheriff Smith's hiring decision, for the reasons discussed below, Plaintiff's claims would likewise fail.

[6] Plaintiff spends several pages criticizing the diligence in the process of hiring Deputy Jackson, such as the failure to call Deputy Jackson's references, request application documents from Civil Service, or conduct a lawsuit check. However, as the Supreme Court counsels in *Bryan Cnty.*, regardless of the extent to which Sheriff Smith examined Deputy Jackson's record, the focus is whether adequate scrutiny of that record would have led a reasonable supervisor to conclude that

In arguing that Deputy Jackson's use of excessive force was a plainly obvious consequence of his hiring, Plaintiff emphasizes that Deputy Jackson has previously been sued three times, two of which alleged excessive force against the mentally ill. (Doc. 82 at 34.) In *John Skinner v. City of Cordova*, the plaintiff alleged that Deputy Jackson forcibly entered his home, stood over him with his firearm drawn, and then assaulted, tased, kicked, and pepper sprayed him. Amended Complaint (Doc. 30 ¶¶ 28–33), No. 6:10-cv-01568 (N.D. Ala. June 21, 2010); (Doc. 82 at 15 ¶ 7). In *Latonvia Shelton v. Jackson*, the plaintiff alleged that Deputy Jackson entered her home unannounced, forced her by her hair into a police car, and then, upon arriving at the jail, beat and maced her. Amended Complaint (Doc. 30 ¶¶ 51, 54–56), No. 6:12-cv-2204 (N.D. Ala. June 19, 2012); (Doc. 82 at 15 ¶ 7).

But there was never any finding of liability in those cases—each of those cases settled and the claims against Deputy Jackson were dismissed. Doc. 90, No. 6:10-cv-01568 (N.D. Ala. June 21, 2010); Doc. 116, No. 6:12-cv-2204 (N.D. Ala. June 19, 2012); (Doc. 73 ¶ 4). Plaintiff has not demonstrated that any of the excessive force allegations against Deputy Jackson "had any merit." *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987). And it is frankly not shocking to the Court that Deputy Jackson has been sued a couple of times for excessive force, given his nearly

excessive force was the plainly obvious consequence of hiring Sheriff Jackson. *Bryan Cnty.*, 520 U.S. at 415.

thirty-year career as a law enforcement officer. *Id.* ("[T]he number of complaints bears no relation to their validity," as many arrestees "use citizens' complaints as a means of harassing officers who arrest them."). Accordingly, Plaintiff has not established that excessive force was the plainly obvious consequence of hiring Deputy Jackson.

And even if Plaintiff had made this showing, Plaintiff has not shown that Sheriff Smith's decision violated clearly established law. The only binding case that Plaintiff directed the Court to is *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown.*[7] In *Bryan Cnty.*, the Supreme Court held that a sheriff's decision to hire a deputy who was later accused of excessive force was not deliberately indifferent, despite the fact that the deputy had previously pled guilty to various driving infractions and other

---

[7] In its previous opinion, the Court directed the parties to *Griffin v. City of Opa-Locka*, 261 F.3d 1295 (11th Cir. 2001). (Doc. 44 at 8.) The Court relied on this case in denying Sheriff Smith's Motion to Dismiss. (*Id.*) Plaintiff has not cited this case in its brief. But even if Plaintiff had drawn on *Griffin* for support, at this stage of the proceedings, *Griffin* does not clearly establish that Sheriff Smith violated a constitutional right. In *Griffin*, the Eleventh Circuit upheld a jury's conclusion that a city's inadequate screening of an applicant's "background was so likely to result in sexual harassment that the City could reasonably be said to have been deliberately indifferent to [the plaintiff's] constitutional rights." 261 F.3d at 1313. The Eleventh Circuit reasoned that the City "was inundated with articles, faxes, and mail, warning of [the applicant's] problems with sexual harassment and dealings with women." *Id.* at 1314. Further, a citizen had attempted to raise concern at a City Commission meeting, the applicant "was a known womanizer," the applicant had sexually harassed employees during the time between his appointment became final, and "a cursory check into [the applicant's] prior employment history would have further alerted the City to prior complaints about [the applicant] with regard to sexual harassment." *Id.* In contrast, Sheriff Smith was not "inundated" with complaints that Deputy Jackson used excessive force. As explained above, Deputy Jackson had been sued on three prior occasions, two of which pertained to his alleged use of excessive force against mentally ill individuals. There was never a finding of culpability in those cases and Plaintiff has not shown they were meritorious, which is especially notable when such allegations are made against law enforcement officers. *Griffin* is not controlling.

misdemeanors like assault and battery. *Bryan Cnty.*, 520 U.S. at 401, 415. While both Deputy Jackson and the deputy in *Bryan Cnty.* were accused by the plaintiffs in their respective cases of excessive force, the comparison ends there. The *Bryan Cnty.* deputy had previously pled guilty to assault and battery, among other offenses, and the Supreme Court still held that the sheriff's hiring decision was not deliberately indifferent. In contrast, Deputy Jackson was hired after two cases alleged, without proving, that he had used excessive force. Therefore, Sheriff Smith did not violate clearly established law, and he is entitled to qualified immunity.

## C. Deputy Jackson and Sherriff Smith are both entitled to State immunity on the wrongful death claims.

Article I, § 14 of the Alabama Constitution provides: "[T]he State of Alabama shall never be made a defendant in any court of law or equity." "The wall of immunity erected by § 14 is nearly impregnable." *Patterson v. Gladwin Corp.*, 835 So. 2d 137, 142 (Ala. 2002).

In arguing that the Defendants are not entitled to State immunity, Plaintiff contends that actions brought against state agents or employees in their individual capacities are not actions affecting state money and therefore are not actions against the State. (Doc. 82 at 38.) According to Plaintiff, because these types of actions are not against the State, state-agent immunity may apply, but State immunity does not. (*Id.*)

"However, the Alabama Supreme Court has two distinct lines of cases for officers created by legislative statute and those created by the Alabama Constitution." *Reynolds v. Calhoun*, 650 F. Supp. 3d 1272, 1276 (M.D. Ala. 2023); *see also Hambric v. Twilley*, 6:23-cv-0078-LSC, 2024 WL 289930, at *3 (N.D. Ala. Jan. 25, 2024); *Ex parte Davis*, 930 So. 2d 497, 500 (Ala. 2005) (explaining the distinction between the immunity owed to statutory officers and constitutional officers). *But see King v. Moon*, ---F. Supp. 3d---, 2023 WL 9419683, at *6 (N.D. Ala. 2023); *McKenzie v. Cleveland*, No. 2:23-CV-00002, 2023 WL 3312539, at *6 (N.D. Ala. May 8, 2023). When a state officer whose office was created by legislative statute (a "legislative officer") is sued in their individual capacity and the plaintiff seeks monetary recovery against the officer personally, the officer may only be entitled to state-agent immunity. *See Ex parte Pinkard*, 373 So. 3d 192, 199–202 (Ala. 2022); *see also Ex parte Cooper*, ---So. 3d---, 2023 WL 5492465, at *4 (Ala. 2023). But "a claim for monetary damages made against a constitutional officer in the officer's individual capacity is barred by State immunity whenever the acts that are the basis of the alleged liability were performed within the course and scope of the officer's employment." *Ex parte Davis*, 930 So. 3d at 500–01. A sheriff is "a constitutional officer as detailed in Art. V, § 112" of the Alabama Constitution. *Ex parte Donaldson*, 80 So. 3d 895, 898 (Ala. 2011) (quoting *Ex parte Shelley*, 53 So. 3d 887, 895 (Ala. 2009)). "[D]eputy sheriffs are immune from suit to the same extent

as sheriffs." *Ex parte Donaldson*, 80 So. 3d at 898 (quoting *Alexander v. Hatfield*, 652 So. 2d 1142, 1144 (Ala. 1994) (internal citations omitted)).

As Sheriff Smith and Deputy Jackson explain, they clearly acted within the course and scope of their duties (Doc. 73 at 41–42)—Plaintiff does not dispute this. Thus, the doctrine of State immunity shields their conduct, provided an "exception" to State immunity does not apply.[8]

Traditionally, sheriffs and their deputies could only be subject to suit five limited circumstances: (1) to compel state officials to perform their legal duties; (2) to compel state officials to perform ministerial acts; (3) to enjoin state officials from enforcing unconstitutional laws; (4) to enjoin state officials from acting in bad faith, fraudulently, beyond their authority, or under mistaken interpretation of the law, or (5) to seek construction of a statute under the Declaratory Judgment Act." *Parker v. Amerson*, 519 So. 2d 442, 445 (Ala. 1987). However, a recent Alabama Supreme Court decision evaluated whether sheriff defendants were subject to suit under a sixth exception: "[A]ctions for damages brought against State officials in their individual capacity where it is alleged that they had acted fraudulently, in bad faith, beyond their authority, or in a mistaken interpretation of law, subject to the limitation

---

[8] The term "exceptions" is a misnomer. While "commonly referred to a 'exceptions' for the sake of convenience or as shorthand," *Ex parte Cooper*, ---So. 3d---, 2023 WL 5492465, at *4 n.6, "in actuality these actions are simply not considered to be actions 'against the State' for § 14 purposes," *Ex parte Moulton*, 116 So. 3d 1119, 1132 (Ala. 2013) (quoting *Patterson*, 835 So. 2d at 142).

that the action not be, in effect, one against the State." *Birmingham Broad. (WVTM-TV) LLC v. Hill*, 303 So.3d 1148, 1159 (Ala. 2020) (quoting *Ex parte Moulton*, 116 So. 3d at 1141).

The first five exceptions are not applicable because Plaintiff seeks monetary damages. The Defendants contend that the sixth exception also does not apply in cases involving sheriffs and their deputies because *Birmingham Broad.* did not explicitly adopt the sixth exception and overrule the long line of cases finding there were only five equitable exceptions to State immunity for sheriffs, nor was the court presented with that long line of cases in the parties' briefing. (Doc. 73 at 47–51.) Further, the Defendants argue that even if the Alabama Supreme Court adopted the sixth exception in *Birmingham Broad.*, this Court should not apply the exception on *stare decisis* grounds. (*Id.* at 48.)

Plaintiff has not presented any argument as to whether the sixth exception to State immunity applies to sheriffs and their deputies. Further, Plaintiff has not argued that, assuming the sixth exception does generally apply to sheriffs and their deputies, it would apply in this case to these defendants. As a result, the Court assumes that Plaintiff has waived the argument as to whether the sixth exception is applicable in

this case.[9] Accordingly, Sheriff Smith and Deputy Jackson are entitled to State Immunity on the wrongful death claims.

## IV.   CONCLUSION

For the reasons explained above, Defendants' Motion for Summary Judgment (Doc. 72) is granted in part and denied in part. The Court will enter an Order consistent with this Memorandum of Opinion.

**DONE** and **ORDERED** on June 27, 2024.

_____
L. Scott Coogler
United States District Judge

215755

---

[9] Even if Plaintiff had not waived this argument, it is clear that Sherriff Smith's conduct would not fall into the sixth exception, as Plaintiff has not presented sufficient evidence for a jury to find that Sheriff Smith was culpable for hiring, retaining, supervising, or training Deputy Jackson.